**SO ORDERED.**

**SIGNED this 19 day of November, 2014.**

_____
Stephani W. Humrickhouse
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

WILLIAM DOUGLAS PARKER, JR., and                    CASE NO. 12-03128-8-SWH
DIANA LYNNE PARKER,

      DEBTORS.

### ORDER ALLOWING DEBTORS' OBJECTION TO CLAIM

The matter before the court is the objection of William Douglas Parker, Jr. and Diana Lynne Parker (the "debtors") to the claim of Georgia Capital, LLC ("GCAP"), and more specifically, to the part of the claim assessing a default rate of interest. A hearing was held on September 30, 2014, and on October 1, 2014, in Raleigh, North Carolina. Because the court finds GCAP's application of the contractual default rate of interest to be inequitable, the court will allow the debtors' objection, and deny that portion of GCAP's claim.

Background

The debtors are the owners of various tracts of real property in North Carolina, and prior to filing bankruptcy, had engaged in the business of developing real estate in and around Raleigh. The debtors have no education in accounting or finance. Thus, they relied on the advice of professionals

in their business pursuits. To advance certain development projects, a representative of the debtors arranged for loans from GCAP.

In February 2009, the first loan from GCAP was made in the face amount of $2,550,000. The purpose of this loan was to replace Regions Bank as a lender and serve as a bridge loan while the debtors attempted to obtain a HUD Loan to provide working capital and construction funds for a development project. The loan was made to William D. Parker, was guaranteed by Diana Parker and Gregory & Parker, Inc., and provided for a term of 18 months with a fixed interest rate of 15%, a default rate of interest of 25% and a 4% late charge. To secure the loan, GCAP took a security interest in certain undeveloped real property owned by the debtors, including 70.34[1] acres of land in Garner, North Carolina, and 1.25 acres of land on Semart Drive in Raleigh, North Carolina. Later, the loan was modified to provide, as additional collateral, another .22 acres on Semart Drive. The tax value on the 70.34 acres alone was $4,100,000. Instead of disbursing the entire face value of the loan, GCAP withheld certain sums, purportedly to cover risk and other expenses. Specifically, GCAP did not disburse: (1) $581,400, such sums to be applied in the future to alleviate risk of not receiving monthly payments; (2) $60,350, as an additional risk reserve for unexpected costs during the life of the loan; and (3) $191,250, as a loan origination fee. In light of the funds GCAP withheld, only $1,717,000 of the $2,550,000 loan was actually disbursed to the debtors.

By the end of the first loan period, the HUD Loan had not yet been closed. On October 14, 2010, the debtors took out another loan from GCAP (the "second loan") with a face value of $1,400,000 to provide them with additional time to close the HUD Loan. The second loan provided

---

[1] Various pleadings refer to this property as being 71.72 acres. For simplicity, the court will refer to this property as 70.34 acres.

for a fixed interest rate of 15%, a default rate of interest of 25% and a 4% late charge.  Other provisions in the second loan afforded additional protection to GCAP on both the first and second loan.  The second loan added several pieces of real property as collateral, including the debtors' 262.41 acre farm in Garner, North Carolina ("Galilee Farm"), and real property in Raleigh, North Carolina owned by Gregory & Parker, Inc., located at 518 S. West Street, 801 Halifax Street, 807 Halifax Street and 5 W. Franklin Street.  GCAP again withheld certain sums from disbursement to the debtors: (1) $186,667 to avoid risk of nonpayment; (2) a $70,000 loan fee; (3) a $127,500 exit fee; (4) a $340,000 interest reserve; (5) $79,687.50 for default interest charged to the first loan; (6) a $100,000 contingency reserve for unexpected costs; and (7) additional closing expenses.  The debtors were only distributed the sum of $178,145.83 from the $1,400,000 loan.

Ultimately, the debtors were unable to obtain the HUD Loan and GCAP began the process of foreclosure on the deeds of trust securing both loans.  The debtors filed a chapter 11 petition on April 25, 2012.  On June 8, 2012, GCAP filed a secured proof of claim in the amount of $4,186,317.33.  On March 11, 2013, the debtors objected to GCAP's Claim No. 4-1 to the extent that it included a default interest component.

At the time of the hearing, the debtors took the position that all principal and interest calculated at the non-default contractual interest rate had been paid from the proceeds of post-petition sales.  GCAP contended that the debtors still owed unpaid principal and default interest under the loans,[2] and asserted a right to both pre-petition and post-petition default interest.  GCAP did not assess or seek recovery of late fees.

---

[2]The parties have presented numerous calculations on this issue.  The court has struggled to reconcile the various calculations.  The exact amount of the claim and the method and accuracy of the calculations are not necessary to the court's holding.

The debtors argue that the application of a default rate of interest amounts to a penalty and is therefore not recoverable. The debtors request that the default rate of interest be disallowed in its entirety and that GCAP be bound to the non-default contract rate of 15% for both pre- and post-petition accruals. GCAP denies that the default rate of interest is a penalty and asserts that it is entitled to a presumption that the contractual default rate of interest is valid, and furthermore, that the debtors have failed to rebut that presumption.

## Discussion

*A. GCAP's Claim for Pre-Petition Default Interest*

GCAP's claim for pre-petition default interest is governed by 11 U.S.C. § 502.[3] 11 U.S.C. § 502(b) ("the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition . . ."); In re Harvest Oaks Drive Assocs., LLC, No. 10-03145-8-SWH, 2011 WL 124495, at *5 (Bankr. E.D.N.C. Jan. 14, 2011) (finding that § 502 applied since the creditors expressly only sought pre-petition default interest). Under § 502(a), "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." If an objection to the claim is made, the court will determine the amount of the claim after notice and a hearing. § 502(b). "[A] properly filed and executed proof of claim constitutes prima facie evidence of the validity and amount of the claim." In re Deep River Warehouse, Inc., No. 04-52749, 2005 WL 1513123, at *2 (Bankr. M.D.N.C. June 22, 2005) (citing Fed. R. Bankr. P. 3001(f); Stancill v.

---

[3]The parties offer arguments regarding pre- and post-petition default interest without offering much, if any, discussion of the distinction between § 506 and § 502. While § 506 applies to post-petition interest, § 502 applies to pre-petition interest. The sections differ in the applicable burdens of proof and presumptions. However, whether the default rate itself is proper and recoverable is analyzed similarly under both sections. Therefore, the court's discussion of the propriety of the default rate relies on cases interpreting and applying both sections.

Harford Sands, Inc. (In re Harford Sands, Inc.), 372 F.3d 637 (4th Cir. 2004)).  However, the claimant must support its claim with sufficient facts for such validity.  Id.  It is the debtor's burden to present evidence to rebut the presumed validity and amount of the claim, but the debtor need not disprove the claim.  Id.  Once the debtor rebuts the prima facie validity, the claimant bears the ultimate burden to prove the validity and amount of the claim by a preponderance of evidence.  Id.

Applying the § 502 framework, GCAP's claim for pre-petition default interest was presumptively valid when it filed its proof of claim.  However, the debtors objected to GCAP's assessment of default interest and introduced evidence tending to rebut the validity of that component of the claim.  Specifically, the debtors introduced evidence that the default rate of interest did not reflect the risks and costs faced by GCAP, and thus was a penalty, because: (1) GCAP faced no realistic threat of nonpayment since it withheld large sums from the face value of the loans and was well oversecured; (2) the *effective* non-default rate is substantially above the market rate; (3) the differential between the non-default rate and the default rate is unreasonably large; (4) GCAP did not disburse the face value of the loans, and allowing default interest would essentially amount to double compensation; and (5) the default rate bore little to no relation to actual or anticipated costs and expenses flowing from the debtors' default.

Although the default rate of interest is presumed to be valid, it is not absolute.  "[A] claim for pre-petition interest, including interest at the default rate if provided for in the parties' agreement, will generally be allowed in accordance with the terms of the contract, 'subject to the equities of the case.'"  Harvest Oaks, 2011 WL 124495, at *7 (quoting In re Mercer's Enters., Inc., No. 04-09168-8-JRL (Bankr. E.D.N.C. Oct. 31, 2005)).  Courts will typically only disallow the default rate of interest when it is punitive.  Deep River, 2005 WL 1513123, at *4.  The general rule

5

is that "'where the circumstances necessitating an equitable deviation are plainly absent and the contract interest rate does not violate state usury laws, function as a penalty, or exceed the value of the collateral, the presumption in favor of the contract rate has not been rebutted.'" Harvest Oaks, 2011 WL 124495, at * 7 (quoting In re Dixon, 228 B.R. 166, 174 (W.D. Va. 1998)).  The mere fact that a default rate arises upon default does not make it a penalty; there must be something more. Harvest Oaks, 2011 WL 124495, at *9.

The debtors concede that the subject loans are exempted from state usury laws.  N.C. Gen. Stat. § 24-9(a)(3).  They also concede that application of the contract interest rate will not result in a claim that exceeds the value of the collateral.  However, they argue that the default rate functions as a penalty.

There are four factors that courts traditionally examine in determining whether to enforce a contractual default rate of interest.  These factors are whether: (1) the creditor faces a significant risk that the debt will not be paid; (2) the lower non-default rate of interest is the prevailing market rate; (3) the difference between the default and non-default rate is reasonable; and (4) the purpose of the default rate is to compensate the creditor for losses sustained as a result of the default or whether it is simply a disguised penalty. Deep River, 2005 WL 1513123, at *3; see also In re Croatan Surf Club, LLC, No. 11-00194-8-SWH, 2012 WL 1906386, at *4 (Bankr. E.D.N.C. May 25, 2012); Dixon, 228 B.R. at 174.  Additionally, some courts consider the sophistication of the parties.  Deep River, 2005 WL 1513123, at *5; Dixon, 228 B.R. at 177.

*1) Risk of Nonpayment*

The debtors argue that GCAP was never at risk of not being paid in full. GCAP asserts it faced substantial risk because the debtors were already in default on another loan when they came to GCAP, the debtors had no viable cash flow, and the collateral was non-income producing.

Low risk of nonpayment has played an important role in courts' assessment of the propriety of default rates of interest. In In re W.S. Sheppley & Co., 62 B.R. 271, 278 (Bankr. N.D. Iowa 1986), the court disallowed the creditor's claim for default interest at 12% and held the creditor to the 9.27% non-default rate. The court found it compelling that the creditor never faced any realistic risk of nonpayment, either before or during the bankruptcy proceedings. Id. The debtor's chapter 11 plan proposed to sell the building securing the creditor's claim, which would pay off the claim in full. Id. at 272. The parties stipulated that the claim with default interest was $4,303,333.75, and without default interest was $4,057,658.74. Id. Evidence placed the value of the property between $5,200,000 and $8,000,000. Id. The court therefore found it clear that the creditor faced no significant risk of nonpayment. Id. at 273. "[I]t is clear that [the creditor] was assured payment of its mortgage debt in full from the collateral at the time this case was filed in September 1984; is assured of payment in full at the present time; and will be assured payment in full by the contemplated outside liquidation date of July 1, 1987." Id.; see also In re Kalian, 178 B.R. 308, 316 (Bankr. D. R.I. 1995) ("[t]hroughout the course of [the debtor's] bankruptcy [the creditor's] collateral's value was protected and its claim was adequately protected by an equity cushion. . . . There was never any cognizable risk that [the creditor] would go unpaid, or even underpaid.").

The debtors argue that, like the creditor in W.S. Sheppley, GCAP was never at risk of not being paid. The debtors point to the undisputed fact that GCAP is oversecured. Two properties,

70.34 acres in Garner and the Galilee Farm, as well as other properties which have now been liquidated, secure GCAP's claim. The county-assessed tax values for the 70.34 acres and Galilee Farm are $4,163,450 and $778,970, respectively. Together, these values alone far exceed GCAP's claim, and did so even prior to the application of any liquidation proceeds.

Additionally, the debtors offered the testimony of Mr. Ira Morris, who stated that GCAP faced little or no risk of non-payment for several reasons: (1) given the amount of funds reserved, the face values of the loans were much lower than represented, making the loan-to-value ratios only 35% on the first loan and 41% on the second loan; (2) GCAP was in a better position as a result of the default because of its right to foreclose on the valuable collateral, and therefore, it made no difference that the property was not income producing; and (3) GCAP withheld significant funds ($1,736,854.50) from the loans to reimburse itself for any costs it might incur. By withholding funds from disbursement, GCAP effectively reduced the amount it loaned, and thus substantially reduced its risk.

The court finds that there is overwhelming evidence that GCAP did not face any significant risk of nonpayment from the debtors. This factor weighs heavily in favor of the debtors.

*2) Non-default Rate Compared to Market Rate*

The next factor is whether the non-default contract rate of interest represents the prevailing market rate. The parties produced conflicting evidence on this factor. Mr. Morris testified that the average interest rate at the time of the first loan was around 6.5%, and was between 6.25% and 7% for non-income producing collateral. He also testified that interest rates were at a historical low at the time of the first loan in 2009, and that other lenders would have been willing to loan money to the debtors. In contrast, GCAP's expert witness, Mr. John Costanzo, testified that the loans were

8

hard money loans–loans made to borrowers that are not creditworthy for projects that are not income producing. Hard money loans close quickly and charge higher interest rates to account for higher risk. Mr. Costanzo stated that the standard rate for hard money loans in North Carolina at the time the loans in question were made was between 14% and 15%, with a default rate of interest between 24% and 25%. The debtors, however, through the testimony of Mr. Morris, showed that in light of the substantial sum reserved by GCAP, the *effective rate* of non-default interest on the funds actually disbursed was 29.04% on the first loan and 25% on the second loan. This testimony was supported by GCAP's own witness, Mr. Whit Marshall, who agreed that the effective non-default rate was 25%. Assuming, *arguendo*, that a 15% non-default rate was appropriate for hard money loans at the time, the *effective rate* of the loans was substantially higher and does not represent the prevailing market rate. This factor also weighs in the debtors' favor.

### *3) Differential between the Non-default and Default Rate*

The next factor is whether the difference between the default rate and the non-default rate is reasonable. GCAP's contractual default rate of 25% is a 67% increase over the non-default rate of 15%. Mr. Morris testified on behalf of the debtors that, at the time the loans were made, the prevailing market spread between non-default rates of interest and default rates was between 2% and 5%, and was between 3% and 9% for restructured loans. Many cases in which the court upheld the contractual default rate involved interest rate differentials of between 3% and 5%. See LBCMT 2007-C3 Seminole Trail, LLC v. Sheppard, No. 3:12 CV 00025, 2013 WL 3009319, at *8 (W.D. Va. June 17, 2013) (6.47% non-default, 9.47% default); In re Lichtin/Wade, LLC, No. 12-00845-8-RDD, 2013 WL 4828151, at *4 (Bankr. E.D.N.C. Sept. 9, 2013) (5% non-default, 8.25% default); Harvest Oaks, 2011 WL 124495, at *2 (6.13% non-default, 11.13% default); In re ACA Real Estate

9

LLC, 418 B.R. 155, 157 (Bankr. M.D.N.C. 2009) (6% non-default, 10% default); Croatan Surf Club, 2012 WL 1906386, at *3 (4.25% non-default, 7.25% default); and Matter of Terry Ltd. P'ship, 27 F.3d 241, 242 (7th Cir. 1994) (14.25% non-default, 17.25% default). Default rates of interest have been upheld with larger differentials, but in cases where the debtor either did not argue the existence of equitable factors, that the rate was a penalty or even that the default rate was unreasonable. See In re Adejobi, 404 B.R. 78, 79-80 (Bankr. E.D.N.Y. 2009) (9% non-default, 24% default ); In re Schatz, 426 B.R. 24, 26 (Bankr. D. N.H. 2009) (7% (7.87% on one claim) non-default, 18% default). Furthermore, the debtor expressly conceded that the spread was not excessive or unreasonable in Croatan Surf Club, 2012 WL 1906386, at *4, and Matter of Terry, 27 F.3d at 244.

The debtors in the present matter argued extensively for consideration of equitable factors, and certainly did not concede that the default rate was reasonable. The fact that the aforementioned cases approved default rates of interest involving much smaller differentials, or where the reasonableness of such rates was not contested, they do not support a finding that the default rate of interest claimed by GCAP is reasonable. When considered in light of the large sums it withheld from its loan disbursements, the court finds that a 67% differential over the non-default rate is unreasonably high. See In re DWS Invs., Inc., 121 B.R. 845, 849 (Bankr. C.D. Cal. 1990) (finding that a 67% differential was unreasonably high and disallowing the default rate of interest; case involved 15% non-default rate and 25% default rate). This factor weighs in favor of the debtors.

*4) Whether the Default Rate is Compensatory or is a Penalty*

The last factor, and the most important to the court's analysis in this case, is whether the purpose of the default rate of interest is to compensate the creditor for costs incurred upon default, or whether it is a penalty.

The evidence tends to show that GCAP intended to coerce performance by the debtors by charging a default rate of interest. "Where the creditor includes the default rate in order to coerce performance by the debtor, rather than as a means of compensating the creditor, the default rate will be deemed a penalty." Deep River, 2005 WL 1513123, at *4. Both GCAP and the debtors produced evidence regarding this factor. Mr. Morris testified that the highest default rate he had encountered in the last ten years was 14%. He stated that default interest rates serve three main purposes: (1) as security when an unusual amount of risk is involved; (2) to cover additional administrative costs upon default; and (3) as a hammer to encourage the borrower to pay on time. Mr. Costanzo, who acted as a broker for GCAP on several other loans during the relevant time period, testified that default rates are used to cover expenses of default, help maintain return requirements, and also to encourage the debtor to stay current. He conceded that an additional reason for default rates is to put maximum pressure on the borrower to make payments. "Where the creditor admittedly includes the default rate in order to coerce performance by the debtor, rather than as a means of compensating the non-breaching party, the default rate will be deemed a penalty." Dixon, 228 B.R. at 175. In Matter of Timberline Prop. Dev., Inc., 136 B.R. 382, 386 (Bankr. D.N.J. 1992), the default rate was 3% higher than the non-default rate, which the court found bore some relationship to actual administrative expenses. However, the creditor itself testified that the default rate was intended to induce payment, and the court found that because of that admitted intent, the default rate was a penalty and ordered that it be disallowed. Id. Mr. Costanzo is not a representative of GCAP and did not offer testimony about the particular reason for GCAP's application of a default rate. However, the court does find it notable that Mr. Costanzo, GCAP's chosen expert and a broker for

11

GCAP on similar loans with similar terms, testified that a purpose of including a default rate of interest was to place pressure on the debtor to perform.

Furthermore, the default rate of interest charged by GCAP on the loans acted as a penalty because of the manner in which the loans were set up and disbursed. GCAP withheld significant sums of money from the loans in order to lessen the risk and compensate it for costs and expenses. Namely, GCAP withheld loan fees, an exit fee, risk reserves, interest reserves, a contingency reserve and a loan origination fee. The debtors introduced evidence that the loan fee on the first loan, which was $191,250, amounted to 7.5% of the face value of the loan, whereas typical loan fees average at 1%. GCAP charged an interest reserve in the full amount of interest to be charged on the loans. Mr. Morris asserted that by deducting interest on the front end while still charging interest on the face value of the loans, GCAP effectively charged interest on top of interest, which substantially increased the cost of interest to the debtors. GCAP contended that the purpose of the interest reserve was to ensure monthly interest payments. Additionally, Mr. Marshall testified that GCAP withheld funds in a contingency reserve to cover its risk and to reimburse it for legal fees, insurance and other unanticipated costs in case of default, such as costs to protect and maintain the collateral, and to pay for utilities, overhead and security. Although such costs are especially important when the collateral is income producing, the debtors' counsel elicited from Mr. Marshall on cross-examination that since the collateral was raw land, many of these expenditures would never be necessary. Rather, Mr. Marshall testified that the reserve was created for the payment of legal fees, management fees, maintenance expenses such as grass cutting, insurance and taxes. However, Mr. Marshall admitted that GCAP had not paid the taxes on the collateral and that its legal fees are assessed and collected separate and apart from, and on top of, the reserved funds and default interest. Mr. Morris testified

that in his thirty-five years of experience he had never seen a loan that set up a contingency reserve in this manner.

By withholding funds for these fees and reserves, and especially for expenses upon default, GCAP compensated itself in advance for any anticipated risk or costs. To allow GCAP to also recover a default rate of interest would amount to a double recovery. As the court in In re Consolidated Props. Ltd. P'ship, 152 B.R. 452, 458 (Bankr. D. Md. 1993), found, "[o]ne charge is reasonable compensation, but a second charge on these facts is a penalty and not reasonable. . . . [I]t is not reasonable to allow [the creditor] a secured claim for default interest in addition to late charges." See also In re Keita, No. 12-19970-PM, 2013 WL 1788033, at *4-5 (Bankr. D. Md. April 26, 2013) ("It is equally well-established that oversecured creditors may receive payment of either default interest or late charges, but not both. . . . Given the high default rate of interest under the Note, the court deems proper relief to be disallowance of the late fee in its entirety."). A default rate of interest is not a reasonable charge when it "compensates for an injury that has already been substantially compensated for in some other way." In re Haldes, 503 B.R. 441, 447 (Bankr. N.D. Ill. 2013) (referring to late charges and attorneys' fees; court ultimately allowed a default rate of interest, but lowered it from the contractual default rate). Taking its cue from these late fee cases, the court finds that the recovery of a default rate of interest along with these other charges would be unreasonable and excessive.

It is important to the court that, despite GCAP's claim that the default rate of interest is justified by the risk it undertook in making the loans, GCAP failed to articulate a sufficient basis for establishing a relationship between the claimed default rate and any actual or projected loss as a result of the default that was not already provided for by the various reserves. Despite GCAP's

13

generalized assertions that the default rate of interest was needed to cover risk and other expenses resulting from default, GCAP was unable to articulate specifically what expenses it realistically faced. Mr. Marshall frequently asserted that the sums GCAP withheld and the default rate were simply its "standard rates." In DWS Invs., 121 B.R. at 849, the court rejected the claimants' argument that the default rate was valid because it was the rate they used in other transactions because they did not show how it was related to actual or projected loss. See In re Tastyeast, Inc., 126 F.2d 879, 882 (3d Cir. 1941) (finding no direct relation between the increased rate and the anticipated loss that a default might have caused the mortgagee and that the mortgagee intended to enforce a penalty upon the debtor); see also In re Hollstrom, 133 B.R. 535, 539-40 (Bankr. D. Colo. 1991) (creditor failed to establish relationship of default interest to actual or projected loss as a result of nonpayment); In re White, 88 B.R. 498, 511 (Bankr. D. Mass. 1988) (default rate of 48%, as compared to the non-default rate of 16.5%, was nothing close to a reasonable estimate of damages, and was "'unreasonably and grossly disproportionate to the real damages.'" (quoting A-Z Servicenter, Inc., 138 N.E.2d 266, 268 (Mass. 1956))). In Hollstrom, 133 B.R. at 539-40, the creditor received "100% reimbursement, full payment, on all its collection expenses," and thus the default rate bore no relation to any actual or projected loss.

Additionally, the fact that there was a great disparity in bargaining power between the debtors and GCAP further evidences the punitive nature of the default rate. As noted above, the debtors are unsophisticated and relied upon third parties in their financial endeavors. In Tastyeast, 126 F.2d at 882, the court found that where there was inequality in bargaining power, the increased interest rate upon default was "definitely intended to enforce a penalty upon the debtor." The court found that "[t]he inequality in [the] bargaining positions is evident since the mortgagee was able to

extract a prepaid interest of approximately 21%. The debtor's overpowering economic need induced it to undertake the risk of the huge increase in interest and the possibility that it would be liable for 30% interest upon its unpaid 21% interest." Id. Similarly, the debtors in the present case agreed to a high non-default interest rate at a time of need, they were already in default on another loan, and they allegedly had no viable cash flow. In Deep River, 2005 WL 1513123, at *4, the court stated that the sophistication of the parties was among the factors it considered in determining that the default rate, a 3% increase in interest, was reasonable. Here, the debtors are unsophisticated, and the non-default/default rate differentials exceeds 10%.

Finally, the court also finds that the *effective* default rate clearly supports a finding that it is unreasonable and a penalty. Because GCAP reserved a substantial sum from disbursement on the loans, Mr. Morris testified that the effective rate of non-default interest on the actual amount of money disbursed was 29.04% and the effective default rate was 39%. Mr. Marshall testified similarly, stating that the effective non-default rate was 25%. The effective rate of default interest that GCAP asserts is so high that the court cannot conclude that it is reasonable. See Hollstrom, 133 B.R. at 539 (where the default rate was 36%, the court noted that, "it may reasonably be inferred in a bankruptcy situation, seems excessive."); In re White, 88 B.R. at 511 (disallowing a default rate of 48%).

In sum, the debtors have more than sufficiently rebutted the prima facie validity of GCAP's claimed default interest, and GCAP has failed to meet its burden of proving the validity of its claim.

*B. GCAP's Claim for Post-Petition Default Interest*

The recovery of post-petition default interest is governed by § 506(b). This section provides that oversecured creditors may recover interest on their claims to the extent of the value

of their collateral. Under § 506(b), the contractual default rate of interest is presumptively valid and applies unless the equities provide otherwise. Dixon, 228 B.R. at 172-73. The debtor bears the burden of rebutting this presumption by *proving* that the equities weigh in favor of its objection. In re Ace-Texas, Inc., 217 B.R. 719, 723 (Bankr. D. Del. 1998). In contrast, under § 502, the debtor need only present evidence to rebut the claim's presumed validity; the burden then shifts to the claimant to prove the amount and validity of its claim. Stancill, 372 F.3d 637. Thus, the debtor has a heftier burden under § 506(b) than it does under § 502.

Despite this heightened burden, the debtors have produced ample evidence to clearly show that the equities and facts of this case support a finding that the default rate of interest is not reasonable and should be disallowed. Although § 506(b) involves a different burden of proof than § 502, courts use the same or similar factors to determine the propriety of default rates of interest. See Hollstrom, 133 B.R. at 539-40; W.S. Sheppley, 62 B.R. at 278 (risk of nonpayment, whether non-default rate was the prevailing market rate, whether the default rate was intended to compensate for risk or penalize). For all the reasons discussed in its § 502 analysis, the court finds that the debtors have met their burden under § 506(b).

## Conclusion

The debtors' objection is allowed and the court orders that the default rate of interest be disallowed in its entirety. GCAP is directed to file a statement of claim, calculated at a non-default rate of interest both pre- and post-petition, showing the remaining balance owing on the two loans, if any, after application of all pre- and post-petition payments.

**END OF DOCUMENT**